**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MONDELĒZ GLOBAL LLC; NESTLÉ USA, INC.; THE HERSHEY COMPANY; THE J. M. SMUCKER COMPANY; THE KRAFT HEINZ COMPANY; and WK KELLOGG CO, <br><br> Plaintiffs, <br><br> v. <br><br> ASR GROUP INTERNATIONAL, INC.; AMERICAN SUGAR REFINING, INC.; DOMINO FOODS, INC.; UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE f/k/a UNITED SUGARS CORPORATION; AMERICAN CRYSTAL SUGAR COMPANY; MINN-DAK FARMERS COOPERATIVE; UNITED STATES SUGAR CORPORATION; COMMODITY INFORMATION, INC.; and RICHARD WISTISEN, <br><br> Defendants. | Case No. 26-cv-8849 <br><br> **Jury Trial Demanded** |

**<u>COMPLAINT</u>**

**TABLE OF CONTENTS**

THE PARTIES AND PRINCIPAL CONSPIRATORS ...............................................................4

I.      Plaintiffs ...............................................................................................................4

II.     Producer Defendants ...........................................................................................6

        A.     ASR/Domino Defendants ........................................................................6

        B.     United Sugar Defendants ........................................................................7

        C.     Commodity Defendants ........................................................................11

        D.     Agents and Co-Conspirators .................................................................12

JURISDICTION, VENUE, AND COMMERCE ......................................................................12

FACTUAL ALLEGATIONS ...................................................................................................13

I.      The Market for Granulated Sugar in the United States.......................................13

II.     The Defendants Have Market Power...................................................................15

III.    Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States.................................................................16

        A.     Defendants Unlawfully Shared Confidential Price and Sales Information with Each Other. .......................................................................16

        B.     Defendants Relied Upon the Exchanged Competitively Sensitive Information. ..........................................................................................32

        C.     Defendants Agreed to a Common Formula to Fix Prices. ....................34

IV.    Sugar Prices' Increase in Parallel During the Conspiracy Period is Evidence of the Existence and Success of the Conspiracy. .........................................................36

V.     Additional Plus Factors Support the Existence of a Conspiracy .......................46

        A.     The Market is Highly Concentrated, and Defendants Are the Dominant Firms. ....................................................................................................47

        B.     Barriers to Entry Are High.....................................................................47

        C.     Demand for Sugar is Inelastic................................................................48

        D.     Defendants Are Vertically Integrated. ...................................................48

i

E. Defendants Had Numerous Opportunities to Collude. ..........................................49

F. Granulated Sugar is a Commodity. ....................................................................51

G. There is a History of Anticompetitive Conduct in the Sugar Industry. .................52

VI. Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act........................................................................................................54

VII. The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible..........58

VIII. Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs to Suffer Antitrust Injury and Damages ...........................................................................................60

LIMITATIONS AND TOLLING................................................................................61

I. Fraudulent Concealment ....................................................................................61

II. Continuing Violation .........................................................................................63

III. *American Pipe* Tolling........................................................................................64

CLAIMS FOR RELIEF ...........................................................................................66

PRAYER FOR RELIEF ...........................................................................................69

JURY TRIAL DEMAND ..........................................................................................69

Plaintiffs Mondelēz Global LLC; Nestlé USA, Inc.; The Hershey Company; The J. M. Smucker Company; The Kraft Heinz Company; and WK Kellogg Co (collectively "Plaintiffs"), by and through undersigned counsel, and upon personal knowledge as to the facts pertaining to themselves and upon information and belief based on investigation of counsel as to all other matters, allege violations of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, by the following producers of granulated sugar (the "Producer Defendants"): (a) ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"); (b) United Sugar Producers & Refiners Cooperative f/k/a United Sugars Corporation ("United Sugar"), American Crystal Sugar Company ("American Crystal"), Minn-Dak Farmers Cooperative ("Minn-Dak"), United States Sugar Corporation ("U.S. Sugar," together with United Sugar, American Crystal, and Minn-Dak, "United"); and by Commodity Information, Inc. ("Commodity") and Richard Wistisen ("Wistisen," together with Commodity, "Commodity Defendants," and together with the Producer Defendants, "Defendants").

## **INTRODUCTION**

1. This action arises from a years-long coordinated scheme among the nation's dominant sugar producers to fix, raise, maintain, and/or stabilize the prices of "Granulated Sugar" (as that term is defined below) in the United States from at least January 2017 through at least October 2024 ("Conspiracy Period").

2. An agreement to share, and the sharing of, competitively sensitive, non-public information among horizontal competitors is itself an unlawful information exchange that is an independent violation of Sections 1 and 3 of the Sherman Act. The Producer Defendants'

1

agreement to share, and the sharing of, confidential price, sales, supply, and demand data with their competitors demonstrates an effective enforcement mechanism of a price-fixing scheme.

3. To implement their price-fixing conspiracy, Defendants exchanged detailed, competitively sensitive, non-public information about Granulated Sugar prices, capacity, sales volume, supply, and demand, in addition to other conduct alleged herein.

4. The Commodity Defendants provided the Producer Defendants with access to a clearinghouse of real-time information on current and forward-looking, non-anonymized data from competitors. The Producer Defendants agreed to use Commodity's clearinghouse to access the non-anonymized data to fix and maintain Granulated Sugar prices among them.

5. Through Commodity and its principal Wistisen, each Producer Defendant agreed to and did supply—and receive—competitively sensitive, detailed, current and forward-looking, non-aggregated, non-anonymized, non-public information, including about their profits, prices, costs, production levels, and sold positions,[1] all of which are key metrics and highly competitively sensitive information in this market that competitors would not share with each other in the absence of an agreement.

6. The Commodity Defendants made available the information they gathered and disseminated only to subscribing sugar producers; it was unavailable to the public and Plaintiffs. In other words, Commodity and its customers—the Producer Defendants and their co-conspirator producers—engaged in a "give to get" scheme, where they gave one another mutual, reciprocal

---

[1] A sold position, as applied here, is the percentage of a seller's supply of Granulated Sugar that is no longer available to purchase. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward.

assurances that they would provide competitively sensitive information so long as their competitors also did so.

7. The antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing. They also prohibit the use of an intermediary to do the same. Simply put, the Producer Defendants cannot use an intermediary to shield their price-fixing scheme and information exchange from antitrust liability.

8. It was contrary to the Producer Defendants' self-interests to share such competitively sensitive information with horizontal competitors. The reciprocal and mutual agreement, and sharing of such information, facilitated and maintained the price-fixing conspiracy and reassured each Producer Defendant that its co-conspiring counterparts would adhere to the conspiracy. The ubiquitous sharing of such information, as in this case, served an important monitoring and enforcement mechanism for the Producer Defendants' price-fixing cartel.

9. In addition to sharing competitively sensitive information that would not be in their unilateral self-interests, other plus factors support the existence of a price-fixing conspiracy: the structure of the Granulated Sugar industry is heavily concentrated and vertically integrated, barriers to entry are high, sugar is a commodity product for which demand is inelastic and the product is fungible, and the Producer Defendants had numerous opportunities to collude, including through trade association meetings.

10. Indeed, Defendants were able to successfully implement their conspiracy because the sugar industry is structurally susceptible to collusion. The industry has been marked by repeated violations of the antitrust laws for more than 80 years, including conduct remarkably similar to that alleged here.

3

11. This information sharing also allowed Producer Defendants to coordinate their pricing strategies based on the prices of raw sugar futures contracts, as discussed below.

12. The Defendants' conspiracy worked. As a result of Defendants' conspiracy, Granulated Sugar prices reached all-time highs during the Conspiracy Period. Even adjusting for inflation using the Consumer Price Index for All Urban Consumers, Granulated Sugar prices experienced one of the steepest climbs on record during the Conspiracy Period.

13. Granulated Sugar prices dropped significantly after plaintiffs began filing antitrust lawsuits against Defendants and others beginning in March 2024.

14. Among the victims of the conspiracy are Plaintiffs, all of whom paid more for Granulated Sugar during the Conspiracy Period than they would have paid in a competitive market but for the unlawful conspiracy and acts in furtherance alleged herein. Collectively, during the Conspiracy Period, Plaintiffs purchased several billion dollars' worth of Granulated Sugar, with a majority of those purchases coming from the Producer Defendants.

## THE PARTIES AND PRINCIPAL CONSPIRATORS

### I. Plaintiffs

15. Plaintiffs Mondelēz Global LLC ("Mondelēz"); Nestlé USA, Inc. ("Nestlé USA"); The Hershey Company ("Hershey"); The J. M. Smucker Company ("Smucker"); The Kraft Heinz Company ("Kraft Heinz"); and WK Kellogg Co ("WK Kellogg") purchased Granulated Sugar during the Conspiracy Period directly from one or more of the Producer Defendants at prices artificially inflated as a result of Defendants' conspiracy.

16. Plaintiff Mondelēz is a limited liability company organized under Delaware law. Mondelēz is a subsidiary of Mondelēz International, Inc., one of the world's largest producers of snack foods such as crackers and cookies. Mondelēz maintains its principal business office in Chicago, Illinois.

17. Plaintiff Nestlé USA is an indirect subsidiary of Nestlé SA, the Swiss parent company of the Nestlé Group. Nestlé USA manufactures some of the most recognizable food and beverage brands in the United States. Nestlé USA is a Delaware corporation and maintains its principal place of business in Arlington, Virginia.

18. Plaintiff Hershey is a leading manufacturer of chocolate, confectionery, and other snack food products in the United States. Since its founding over 125 years ago, Hershey and its subsidiaries have grown to be the largest producers of quality chocolate in North America and a global leader in chocolate and confectionery. Hershey's products include some of the most renowned chocolate brands such as Hershey's and Kisses chocolates. Hershey is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Pennsylvania.

19. Plaintiff Smucker is a leading manufacturer and marketer of branded food and beverage products throughout North America. Smucker's portfolio includes well-known brands across multiple categories, including coffee, peanut butter, fruit spreads, pet food and pet snacks, sweet baked snacks, and other consumer packaged foods. Smucker develops, manufactures, markets, and distributes these products through national retail, foodservice, and e-commerce channels. Smucker is a corporation organized and existing under the laws of Ohio, with its principal place of business in Orrville, Ohio, and a regional corporate office in Chicago, Illinois.

20. Plaintiff Kraft Heinz is a global food and beverage manufacturer incorporated in Delaware, with a principal place of business in Chicago, Illinois, and with operations in the Northern District of Illinois, including a Chicago headquarters, a Glenview research and development facility, and a Woodstock manufacturing facility.

21. Plaintiff WK Kellogg is a food manufacturing company that produces some of the leading breakfast cereals in the US. WK Kellogg is a Delaware corporation and maintains its principal place of business in Battle Creek, Michigan. Before October 2, 2023, WK Kellogg purchased Granulated Sugar from the Producer Defendants and their co-conspirators as part of the Kellogg Company.

## II. Producer Defendants

### A. ASR/Domino Defendants

22. Defendant ASR Group is a privately held corporation incorporated in Florida with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. It is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire Fanjul Corp. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

23. By its own account, ASR Group is "the world's largest refiner and marketer of cane sugar with an annual production capacity of 6 million metric tons of sugar." It owns six sugar refineries in North America, including four in the United States: Yonkers, New York; Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California. It sells its products to "customers in key channels, including grocery, industrial, foodservice and specialty."

24. ASR Group owns, as subsidiaries, Defendants Domino and ASR (collectively with ASR Group referred to in this Complaint as "ASR/Domino"). Domino is ASR Group's and ASR's marketing and sales subsidiary for Granulated Sugar, with a current principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida. ASR is the ASR Group's U.S. operating subsidiary, and its principal place of business is also in West Palm Beach.

6

25.     ASR/Domino sells Granulated Sugar under several well-known brand names, including Domino®, C&H, Florida Crystals, Redpath, Tate & Lyle, Lyle's, and Sidul, as well as under various private-label store brands.

26.     ASR/Domino maintains a formal code of conduct that expressly prohibits its employees from discussing ASR/Domino's pricing with competitors. That policy did not stop ASR/Domino personnel from systematically providing Wistisen with non-public, confidential, commercially sensitive pricing data, sold positions, and other competitively sensitive information—with full knowledge he would pass it to their competitors.

**B.     United Sugar Defendants**

27.     Defendant United is a Minnesota marketing cooperative with its principal place of business in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation ("U.S. Sugar"), a producer that owns and operates a cane mill and cane refinery in Clewiston, Florida, and wholly owns United States Sugar Savannah Refinery, LLC ("U.S. Sugar Savannah")[2]; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC. The latter three grow and process sugar beets at eight facilities across Minnesota, Montana, North Dakota, and Wyoming. United markets sugar under United, Crystal Sugar, Imperial, and Dixie Crystals brands, the latter two having been acquired when U.S. Sugar purchased Imperial.

28.     United describes its business model as a "fully integrated" operation capable of "provid[ing] and transport[ing] sugar throughout the nation." The cooperative has nine sugar producing plants, concentrated largely along the Minnesota-North Dakota border in the Red River

---

[2] U.S. Sugar Savannah was formerly known as Imperial Sugar Co.

7

Valley, with additional production facilities for beet sugar in Montana and Wyoming and for cane sugar in the Florida Everglades.

29. United functions as a single commercial entity for competitive purposes, consolidating the marketing and sales of Granulated Sugar produced by its member-owners. It identifies customers, negotiates sales contracts, manages logistics, and sets prices for all products it sells on its members' behalf. United distributes Granulated Sugar in bulk by truck and rail, as well as in packaged form ranging from retail-size bags to super sacks of 2,000 pounds.

30. United served as the authorized commercial and pricing agent for each of its member-owners—U.S. Sugar, American Crystal, Minn-Dak, and Wyoming Sugar—including in dealing with Plaintiffs and the Commodity Defendants. United's exchanges of competitively sensitive information with the Commodity Defendants were conducted in that representative capacity. The pricing intelligence United transmitted to and received from the Commodity Defendants reflected the production and pricing of each member whose sugar United was authorized to price and sell. Every member-owner participated in and derived benefit from United's bilateral exchange with the Commodity Defendants.

31. Neither United nor its members publicly disclose current Granulated Sugar prices or sold positions; they instead treat that information as confidential and prohibit employees from sharing it. Nevertheless, United routinely and deliberately disclosed its members' sold positions to the Commodity Defendants, knowing that Wistisen would redistribute that information to other Producer Defendants and co-conspirators, and that United's members would receive competitively sensitive data in return. United's own executive vice-president of sales, Dirk Francis Swart, confirmed the arrangement, testifying in an antitrust proceeding brought by the U.S. Department of Justice ("DOJ") concerning the proposed merger between U.S. Sugar and Imperial, that United

8

knew Wistisen was *"going to share information and we want[ed] the information that gets shared to be accurate."*

32.     Defendant American Crystal Sugar Company ("American Crystal") is a Minnesota corporation and agricultural cooperative headquartered in Moorhead, Minnesota. The largest beet sugar manufacturer in the United States, American Crystal operates five factories in the Red River Valley and has approximately 2,600 grower-shareholders, generating roughly $1.5 billion in annual revenue. As a founding member of United, American Crystal markets its sugar production through United, which holds full authority to price and sell American Crystal's sugar on its behalf. American Crystal received the benefit of the reciprocal competitor intelligence obtained through the conspiracy, which directly informed the pricing decisions of its own products. On information and belief, American Crystal's competitively sensitive information—such as its pricing, sold position, and production—was part of United's information exchange with the Commodity Defendants, other Producer Defendants, and their co-conspirators. In return, United and American Crystal received—through the Commodity Defendants—the other Producer Defendants' and their co-conspirators' competitively sensitive and non-public information about pricing, sold status, and production.

33.     Defendant Minn-Dak Farmers Cooperative ("Minn-Dak") is a North Dakota agricultural cooperative headquartered in Wahpeton, North Dakota, and the first sugar beet cooperative in the United States, formed in 1972. Minn-Dak operates a single factory in Wahpeton with approximately 500 grower-shareholders farming 115,000 acres. As a founding member of United, Minn-Dak markets all of its production through United, which has full authority to price and sell Minn-Dak's sugar on its behalf. Minn-Dak received the benefit of reciprocal competitor intelligence obtained through the conspiracy, which directly informed the pricing decisions of its

9

own products. On information and belief, Minn-Dak's competitively sensitive information—such as its pricing, sold position, and production—was part of United's information exchange with the Commodity Defendants, other Producer Defendants, and their co-conspirators. In exchange, United and Minn-Dak received—through the Commodity Defendants—the other Producer Defendants' and their co-conspirators' competitively sensitive and non-public information about pricing, sold status, and production.

34. Defendant United States Sugar Corporation ("U.S. Sugar") is a privately held Florida corporation headquartered in Clewiston, Florida. The largest sugarcane producer in the United States by volume, U.S. Sugar farms more than 230,000 acres in South-Central Florida and accounts for approximately 13% of total U.S. refined sugar through its vertically integrated milling and refining operation in Clewiston. As a founding member of United, U.S. Sugar provides the Florida cane component of United's cross-commodity marketing operation and markets its production through United, which holds full authority to price and sell U.S. Sugar's output on its behalf. U.S. Sugar received the benefit of the reciprocal competitor intelligence obtained through the conspiracy, which directly informed its own pricing decisions. On information and belief, U.S. Sugar's competitively sensitive information—such as its pricing, sold position, and production— was part of United's exchanges with the Commodity Defendants, other Producer Defendants, and their co-conspirators. In return, United and U.S. Sugar received—through the Commodity Defendants—the other Producer Defendants' and their co-conspirators' competitively sensitive and non-public information about pricing, sold status, and production.

35. U.S. Sugar Savannah, not named as a defendant, is a Delaware company operating in Georgia and wholly owned by U.S. Sugar. On November 30, 2022, U.S. Sugar Savannah completed its acquisition of Imperial Sugar Co. ("Imperial") and now holds Imperial Sugar's

10

trademarks. The acquisition was a continuation in all but name: former Imperial employees remained in place, existing supply contracts were assumed without interruption, customer service and sales contacts stayed the same, and payments were redirected to U.S. Sugar Savannah's account with no disruption to customers.

36. Defendant United and its member owner (but not individually named defendant) U.S. Sugar Savannah/Imperial are sometimes collectively referred to herein as United on or after November 30, 2022.

### C. Commodity Defendants

37. Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058. As of this filing, Commodity appears to no longer be operating. During the Conspiracy Period, it functioned not as a legitimate market intelligence provider but as a purpose-built entity for the exchange of competitively sensitive information among Producer Defendants and co-conspirators. Commodity had no public presence, had no website, did no public advertising, and did not make publicly available any reports or analysis of the sugar industry. Its function was to serve the select group of sugar producers who participated in the conspiracy.

38. Defendant Wistisen was the principal of Commodity who, pursuant to Defendants' unlawful agreement, gathered and disseminated confidential, proprietary, and competitively sensitive non-public information between the Producer Defendants. Commodity and Wistisen operated as alter egos; reference to one encompasses both.

39. Throughout the Conspiracy Period, the Producer Defendants utilized Wistisen to facilitate the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information, regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy.

11

### D.     Agents and Co-Conspirators

40.     Other individuals, firms, and entities not named here participated as co-conspirators with Defendants and took actions in furtherance of the conspiracy. Defendants bear joint and several liability for their co-conspirators' conduct regardless of whether those co-conspirators are named defendants.

41.     Any allegation directed at an act of a corporate defendant encompasses conduct undertaken by that entity through its officers, directors, agents, employees, or representatives acting in the scope of their authority over the corporation's business.

42.     Defendants are likewise liable for acts taken in furtherance of the conspiracy by entities they acquired through mergers, acquisitions, asset purchase agreements, or other business combinations.

## JURISDICTION, VENUE, AND COMMERCE

43.     Plaintiffs bring this action under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

44.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337.

45.     Venue lies in this District under 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b). During the Conspiracy Period, Defendants resided in, transacted business in, and were found in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

46.     During the Conspiracy Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a direct, substantial, and reasonably foreseeable effect on, the interstate commerce of the United States and its territories.

47.     During the Conspiracy Period, in furtherance of their unlawful scheme, Defendants employed the instrumentalities of interstate commerce, including electronic communications

12

transmitted over interstate wires and wireless networks, rail and highway transportation crossing state lines, and the U.S. mail.

48.    Defendants' conduct also had a substantial effect on the intrastate commerce of each of the 50 States and the District of Columbia.

49.    This Court has personal jurisdiction over each Defendant. Each Defendant transacted business within, maintained substantial contacts with, and engaged in unlawful conduct within and/or directed at the Northern District of Illinois. The conspiracy was designed to—and did—injure purchasers residing in, operating in, or doing business in this District, as well as throughout every state, territory, and the District of Columbia.

## FACTUAL ALLEGATIONS

### I.    The Market for Granulated Sugar in the United States

50.    The U.S. sugar production process begins in beet and cane fields, with beet sugar accounting for about 56% of domestic production and cane sugar the remaining 44%. Beet and cane sugar are reasonably interchangeable once refined.

51.    "Granulated Sugar," commonly called "white" or "table" sugar, is produced by extracting juice from sugarcane or sugar beets, clarifying and concentrating that juice into a thick syrup, boiling the syrup until crystals form, centrifuging the crystals to separate them from residual syrup, drying them with hot air, and grinding them to a uniform size. Granulated Sugar may be delivered in dry or liquid form (i.e., Granulated Sugar mixed with water).

52.    Granulated Sugar is considered the gold standard of sweeteners and accounts for 80% of Refined Sugar sold in the U.S. [3] It is valued for its clean, pleasant sweetness and the

---

[3] "Refined Sugar," as that term is used herein, refers to sugar that is extracted from sugar cane or sugar beets and processed to yield food grade sugar. Granulated Sugar is one type of Refined Sugar, along with brown sugar and powdered sugar.

absence of aftertaste. It is the most common sugar used in Plaintiffs' food products. Consumers tend to dislike any sugar substitute that does not replicate its taste and functional profile.

53. The U.S. sugar processing industry generated an estimated $13.5 billion in revenue in 2024.

54. Producer Defendants—directly or through their marketing affiliates—sell Granulated Sugar to food and beverage manufacturers (including Plaintiffs), retailers, and food service companies, and distributors that resell or process it into other sugar products. Food and beverage manufacturers (including Plaintiffs) purchase Granulated Sugar for delivery in both dry and liquid form. For example, food and beverage manufacturers (including Plaintiffs) may agree to purchase a certain amount of Granulated Sugar over time with the option of taking future delivery of that amount in dry or liquid form, with the amount for delivery of Granulated Sugar in liquid form consisting of the price of Granulated Sugar in dry form plus additional fees.

55. Granulated Sugar is a functional ingredient in commercial food production, used by bakeries, restaurants, confectionaries, and food manufacturers, as well as consumers in baking, cooking, and beverages.

56. Regardless of whether it derives from cane or beets, and whether delivered in dry or liquid form, Granulated Sugar is a commodity—largely undifferentiated across producers and competing primarily on price. As a result, a commodity such as Granulated Sugar is susceptible to cartel behavior. Moreover, the high barriers to entry and an effective cap on imports make Granulated Sugar particularly susceptible to cartel behavior.

57. Because of the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer affect the market price for Granulated Sugar.

## II.     The Defendants Have Market Power

58.     During the Conspiracy Period, the Producer Defendants collectively controlled approximately 65% of the market for Granulated Sugar in the United States ("Relevant Market"). They were fully aware of their dominance. For example, when news broke that United would be acquiring Imperial, an ASR/Domino executive noted the deal left "1 less competitor" and that "now 3 companies account for 75% of the market."[4]

59.     The 2024 estimated market share of each Producer Defendant by capacity is shown in Figure 1 below:

| Marketing Entity | Refining Entity | Capacity (cwt) | % Share |
|---|---|---|---|
| Domino Foods, Inc. | American Sugar Refining, Inc. | | |
| | Chalmette, LA | 20,500,000 | |
| | Baltimore, MD | 16,500,000 | |
| | Crockett. CA | 17,000,000 | |
| | Yonkers, NY | 12,250,000 | |
| | Florida Crystals Corp. - South Bay, FL | 6,600,000 | |
| | Total | 72,850,000 | 30% |
| United Sugar Cooperative | American Crystal Sugar Co. | 40,000,000 | |
| | U.S. Sugar Corp. – Clewiston, FL | 18,000,000 | |
| | U.S. Sugar Savannah Refinery - Savannah, GA | 18,600,000 | |
| | Minn-Dak Farmers Co-op – Wahpeton, ND | 9,600,000 | |
| | Wyoming Sugar Co. - Worland, WY | 1,100,000 | |
| | Total | 87,300,000 | 36% |
| National Sugar Marketing LLC | Amalgamated Sugar Co. | | |
| | Snake River Sugar Co. | 23,500,000 | |
| | Southern Minnesota Beet Sugar Cooperative | | |
| | Renville, MN | 10,100,000 | |
| | Brawley, CA | 3,350,000 | |
| | Total | 36,950,000 | 15% |
| Cargill, Inc. | Louisiana Sugar Refining LLC - Gramercy, LA | 20,000,000 | 8% |
| Michigan Sugar Co. | Michigan Sugar Co. | 14,500,000 | 6% |
| Western Sugar Cooperative | Western Sugar Cooperative | 12,000,000 | 5% |
| Grand Total | | 243,600,000 | |

**Figure 1.**

60.     The total market share of the Producer Defendants is approximately 65%. The market dominance of the Producer Defendants means that smaller sugar producers could not (and

---

[4] Attachment to Motion for Protective Order by American Sugar Refining, Inc. [Redacted], Email from ASR/Domino's Adam Whittaker dated 3/25/21, *United States v. U.S. Sugar Corp. et al.,* No. 21-cv-1644-MN (D. Del. April 18, 2022), ECF No. 207-24, at 2.

co-conspirators not only could not but would not) act as effective competitive constraint on Producer Defendants' dominance and their supra-competitive pricing. Instead, as market leaders, the Producer Defendants account for the supermajority of Granulated Sugar production, sales, and capacity (even without regard to non-defendant co-conspirators). Plaintiffs were particularly susceptible to the Producer Defendants' market dominance because, as bulk purchasers, Plaintiffs did not have the ability to use smaller market participants to meet their purchasing needs.

61. The domestic market for Granulated Sugar has undergone significant consolidation, facilitating cartel conduct and amplifying the conspiracy's effectiveness. For instance, in 2019, United sought to acquire Imperial from Louis Dreyfus—a move that would further reduce the number of meaningful competitors. Subsequently, U.S. Sugar, one of United's four members, entered into an asset purchase agreement to acquire Imperial through subsidiary U.S. Sugar Savannah, resulting in United marketing and selling all of Imperial's Granulated Sugar production.

62. In 2021, the DOJ sued to block the acquisition, arguing that it would concentrate the overwhelming majority of sales across the Southeastern United States in the hands of just two producers and drive up prices for businesses and consumers in that region. The district court that considered the merger challenge declined to block the transaction because it was not persuaded by the DOJ's limitation of the relevant geographic market to the Southeastern United States. The merger was finalized on November 30, 2022.

III. **Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States.**

A. **Defendants Unlawfully Shared Confidential Price and Sales Information with Each Other.**

63. If they were true competitors, the Producer Defendants and their co-conspirators would not have made "daily, weekly, and monthly reports of the minutest details of their business to their rivals." *American Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921). Yet

16

for years, Defendants did exactly that. Defendants engaged in a systematic and deliberate scheme to exchange competitively sensitive, non-public information to suppress competition and maintain artificially high prices for Granulated Sugar in the United States. Through a network of coordinated exchanges facilitated primarily by the Commodity Defendants, the Producer Defendants and their co-conspirators shared and received current pricing, sold positions, crop size and yields, and forward-looking price strategies. These exchanges were neither anonymized nor publicly accessible, serving only the agreed conspiratorial purposes of the Producer Defendants. The Producer Defendants did not share such information in the absence of an agreement.

64. This information was shared for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another. The information sharing scheme is a plus factor that supports the existence of a *per se* unlawful conspiracy to raise, fix, maintain, and/or stabilize prices of Granulated Sugar during the Conspiracy Period.

65. Additionally, Defendants' information sharing scheme is, in and of itself, an independent violation of Section 1 of the Sherman Act, analyzed under the Rule of Reason.

66. ***Mechanism of Information Exchange.*** The Commodity Defendants acted as a clearinghouse, collecting detailed, sensitive non-public information from the Producer Defendants (and their co-conspirators), and rapidly redistributing it by agreement to other Producer Defendants (and co-conspirators). The information exchanged allowed the Defendants to avoid price competition and coordinate their pricing strategies in real-time. For example, sold positions provided critical insights into each competitor's pricing flexibility. By knowing when a rival was nearing full capacity, the Producer Defendants could confidently raise prices without fear of being undercut by their ostensible rivals.

17

67. The role of the Commodity Defendants in facilitating this scheme was crucial. The Commodity Defendants' role was that of a purpose-built tool, not a legitimate market analyst. Unlike genuine market analysts or industry research services, Commodity had no public presence, did not market its services to the public, and did not publish anonymized market research. This exclusive and secretive arrangement underscored the Producer Defendants' intent to limit access to critical market information and maintain their price-fixing conspiracy.

68. The Commodity Defendants did not gather information through voluntary surveys or periodic polling that they anonymized. Instead, each Producer Defendant (and co-conspirators) regularly transmitted competitively sensitive, current or forward looking, non-anonymized, non-public pricing and sold-position data directly to Wistisen, who promptly passed it—unaggregated and unredacted—to the other Producer Defendants and co-conspirators. The exchange was rapid and intended to raise, fix, and maintain prices.

69. Commodity withheld this competitively sensitive information from those outside the conspiracy—including Plaintiffs, other of Producer Defendants' customers and others in the sugar supply chain—strengthening the advantage that the Producer Defendants gained through the conspiracy.

70. Commodity's pricing structure itself evidenced the conspiracy. In recognition of the value of the competitively sensitive and non-public information they were receiving, subscribers paid Commodity for its services and reports.

71. Defendants shared this information to enable Producer Defendants and their co-conspirators to effectuate their agreement to artificially affect prices and avoid competing with one another. The Producer Defendants understood the competitive sensitivity of the information they provided to the Commodity Defendants, and the Commodity Defendants understood that the

18

competitively sensitive information the Producer Defendants and co-conspirators shared would not ordinarily or rationally be disclosed to competitors in a competitive market. The purpose of their information sharing was to enable the Producer Defendants and their co-conspirators to raise, fix, maintain, stabilize, and/or coordinate prices of Granulated Sugar in the United States.

72. ***Effect on the Market.*** By maintaining a shared, real-time understanding of each other's pricing, sold positions, and forward strategies, the Producer Defendants effectively eliminated meaningful competition. The United States Department of Agriculture's ("USDA's") restrictive production allotments and import limitations further amplified the anticompetitive effects by limiting the possibility of new entry, alternative suppliers, and imports that might otherwise have provided an alternative to the Producer Defendants and their co-conspirators. Wholesale and retail Granulated Sugar prices rose significantly during the Conspiracy Period, without any corresponding increase in production costs or supply constraints.

73. Because of the USDA's production allotments linked to USDA loan programs, import restrictions, and tariffs that effectively limit imports, each Producer Defendant knows that if domestic competitors are short on their supply of Granulated Sugar, it can substantially raise prices without risk that customers can turn to imports to avoid the price increase. Thus, receiving information about other Producer Defendants' and co-conspirators' sold positions, particularly as those sold positions reached capacity, enabled each Producer Defendant's execution of the price-fixing conspiracy and reinforced each Producer Defendant's ability to fix, raise, maintain, and/or stabilize prices knowing that its customers could not turn to another supplier (domestic or foreign) for a lower price.

74. The information exchange was in real-time. The Commodity Defendants distributed the information they gathered rapidly, often within hours of having received it. The

Producer Defendants and co-conspirators then incorporated that competitively sensitive market intelligence directly into their pricing decisions, enabling them to extract supra-competitive prices from Plaintiffs and other consumers throughout the Conspiracy Period.

75. Armed with non-anonymized, competitively sensitive, non-public information exchanged contemporaneously through the Commodity Defendants, the Producer Defendants and co-conspirators could fix their prices with more confidence that their rivals would not undercut them. The Producer Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and sold positions only because the Commodity Defendants collected this competitively sensitive information from each of them and shared it with the other, pursuant to their unlawful agreement.

76. As large direct purchasers of Granulated Sugar, Plaintiffs were directly harmed by this conspiracy. Knowing in advance what other suppliers were offering, in what quantities, and how aggressive other Producer Defendants and co-conspirators could and would be in pricing allowed Producer Defendants to price accordingly, eliminating the competitive tension that would otherwise have driven prices down.

77. The exchange of pricing, crop size and yield, and sold-position data was designed to—and did—produce Granulated Sugar prices higher than those that would have prevailed in a competitive market unaffected by Defendants' anticompetitive agreement. The Producer Defendants knowingly and intentionally sought, shared, received, and deployed this non-public, competitively sensitive information from the Commodity Defendants pursuant to their anticompetitive agreement for the express purpose of raising, fixing, maintaining, and stabilizing Granulated Sugar prices.

20

78.     For example, United does not publish the company's current Granulated Sugar prices or its sold position. United's sold position was confidential, and its employees were not supposed to share that information. Nevertheless, United did intentionally and regularly share its sold position with Wistisen, who United knew would in turn share it with ASR/Domino and other competitors.

79.     As noted above, United Sugar's sales executive Dirk Francis Swart testified that United Sugar shared information with Wistisen because United "know[s] he's going to share information and we want the information that gets shared to be accurate."

80.     ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Wistisen knowing that he would provide the information to other competitors.

81.     The unlawful agreement to fix prices was implemented through information exchanged through Commodity, which included current pricing, future or forward pricing, pricing strategies, and sold positions. The conspiracy also included price signaling among Defendants, and upon information and belief, communications made through other conduits including persons and/or software platforms.

82.     ***Evidence of Coordinated Conduct.*** The conspiratorial exchanges between the Defendants were neither incidental nor benign. For example, on multiple occasions, senior executives at Producer Defendants explicitly sought to signal pricing intentions to their competitors. Internal communications reveal efforts to share updates on market "tightness," forward-looking price increases, and inventory conditions through Commodity, ensuring

21

alignment among the Producer Defendants. These exchanges were instrumental in setting supra-competitive prices.

83. The exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

84. The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Mr. Wistisen of Commodity pursuant to their anticompetitive agreement as alleged below, in order to raise, fix, maintain, or stabilize Granulated Sugar prices.

85. Although Plaintiffs have not yet conducted discovery, they have obtained direct evidence of the Defendants' conspiracy, including evidence of conspiratorial communications sharing competitively sensitive information. Examples of the communications that were a part of and furthered the conspiracy are below.

86. On information and belief, no later than in or about January 2017, the Commodity Defendants began soliciting, accepting, and distributing competitively sensitive information from the Producer Defendants and their co-conspirators.

87. On or about September 16, 2019, Wistisen asked ASR/Domino's Vice President of Industrial Sales Alan Henderson to disclose ASR/Domino's 2020 pricing and sold positions, inquiring, "Wondering where you would put refined prices and coverage?" Henderson responded: "Pricing for FY20: Northeast - $38.50 bulk basis Gulf - $36.50 bulk basis West - $39.00 bulk basis Cane refiners should be close to 70 to 75% covered for FY20. The open business that does remain will be at higher prices." ASR/Domino disclosed this confidential information with full knowledge

22

it would be shared with its competitors and with the expectation of receiving competitors' confidential information in return. Wistisen confirmed the reciprocal nature of the exchange, noting that he would send crop and pricing updates in the next day or two and that "[t]he price updates I did receive today didn't have nearly the level of cane price increases you reported ... but I bet they're headed that way[.]"

88. Commodity was not the only conduit of information between the Producer Defendants during this time period. On or about November 15, 2019, Gerald Kramer of Kramer Brokerage Co. shared Domino price quotes and inventory details with multiple managers of Louis Dreyfus, writing: "[a]lso told that Domino still has sugar to sell." In response, Jim Evans, National Sales Manager at Louis Dreyfus expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President of Sales & Marketing at Imperial, in the same email chain, asked Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob[5] refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

89. On or about January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed ASR/Domino's Henderson that "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

---

[5] "FOB" or "fob" is an abbreviation for Free on Board. Free on Board is an industry term of art that means the buyer takes the goods free of freight charges at the seller's location; in other words, any transportation related costs are not included.

23

90.     On or about March 3, 2020, Henderson sent an email to Sproull captioned "Colloquium Recap," summarizing competitive intelligence gathered at the International Sweetener Colloquium ("ISC"), including the following pricing data for competitors in fiscal year 2021: "Michigan Sugar firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk," "NSM - still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial - 38.00/38.50 for CY 2021 on bulk EFG." The email confirms that the ISC was used not merely for industry networking but as an active venue for gathering and transmitting competitor pricing intelligence.

91.     The Producer Defendants provided accurate information to each other through Wistisen. ASR/Domino was typically "upfront" with the information it provided to Wistisen, and Wistisen reciprocated in kind. As one example, in August 2020, Henderson disclosed to Wistisen pricing updates for ASR/Domino's Granulated Sugar. Then, on or about August 17, 2020, Wistisen wrote to Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Henderson responded:

> [...]
> Quick Update:
> Pricing:
> Northeast- $39.00 to $40.00 BULK
>
> South - $37.50 to $37.75 Bulk FOB - fighting Cargill mainly
> West - $39.50 to $40.00 Bulk FOB - values staying strong...
>         Cane gulf still fighting for share - but some talk of Cargill moving
>         prices up to $37.50 gross fob.
> Coverage:
> Beets - 70 to 75%
> Cane - 50 to 55%
> [...]

24

92. ***The Producer Defendants Knew Wistisen's Competitively Sensitive Information Came Directly from their Competitors.*** Wistisen routinely confirmed to both United and ASR/Domino that the intelligence he provided to them came directly from their competitors. For example, he wrote to United that "ASR saying back up to $40.50 to $41." Wistisen told Henderson that "the United [pricing and sold position] info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When Wistisen lacked a competitor's pricing, he said so explicitly—telling Henderson he did not yet have Michigan's pricing but that he "hope[d] to talk with them [Michigan] on Fri./Mon." Each of these communications confirms that Wistisen was not synthesizing public information; he was relaying identified, real-time intelligence from named producers to their named rivals.

93. Wistisen turned around pricing and sold position intelligence to the Producer Defendants rapidly—often within minutes of having received it. On or about September 21, 2020, within minutes of each other, Wistisen asked both ASR/Domino's Henderson and Eric Speece, a Director of Strategic Accounts at United, whether there was "[a]nything new of interest on the pricing front?" Both responded with their company's respective pricing and sold positions. Speece shared: "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." Wistisen replied by thanking United "for keeping the communication lines open!"—an acknowledgment that the flow of intelligence was ongoing, expected, and valued.

94. The following day, on or about September 22, 2020, Henderson provided ASR/Domino's pricing in full:

Pricing (Cane)

North and mid-Atlantic - $40.50 to 41.00 FOB - prices were lower past few weeks but have firmed up to these levels. No discounting at this time.

Gulf - $38.50 fob

West - $40.50 to $41.00 fob firm

Note - higher levels for the Oct./Dec. 20 period as most cane and beet companies are well sold and/or filling past force majeure volume.

I'm hearing most cane guys 70 to 75% booked with the exception of Cargill at 90%??

Beet prices below seem accurate and coverage at 90% I believe is about right.

95. On or about September 22, 2020, less than three hours after receiving Henderson's response, Wistisen relayed to United and ASR/Domino each other's competitive intelligence—in emails sent less than a minute apart. To ASR/Domino, Wistisen wrote: "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month. Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at the low price, industry coverage 87%, all but NSM over 90+% booked." To United, Wistisen wrote: "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and the other southern refiners up 10-15% from the average. . . . Waiting for confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)." Within a single afternoon, ASR/Domino and United had each other's current pricing and sold positions.

96. In or about mid-November 2020, Wistisen contacted both Speece at United and Henderson at ASR/Domino within approximately 40 minutes of each other asking, "where would [they] put . . . prices?" Both responded that day with pricing information.

97.     On November 16, 2020, Wistisen wrote to Henderson at ASR/Domino: "Curious what you're hearing on domestic raw and refined pricing? I haven't heard back from United yet. Did they pullback [sic] from spot market? Where would you put prices and cane coverage?"



98.     Henderson responded later that day with ASR/Domino's current pricing and inventory: "Prices have firmed up again based on higher # 16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations. For calendar 2021: East/West - $42.00 fob[;] Gulf -$39.50 fob [;] Cane Coverage - 85-90%[.]" On or about November 17, 2020, after hearing back from United, Wistisen forwarded United's position to Henderson: "So strange, I can't wrap my head around United's approach. They came up very short on production, and market has firmed, but they're still at $36.50 RRV and $38.50 Southeast?!?! But did say they'll probably be taking prices higher given strong sold position . . .

27

Waiting to hear back from a number of contacts." Wistisen also communicated the ASR pricing and inventory information to United on that same day, completing the circuit.

99.     On or about January 19, 2021, Wistisen delivered several paragraphs of information on developments in the sugar industry intelligence to United before closing with a direct ask: "Has United put out a price range on FY22?" On or about January 20, 2021, Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

100.     Wistisen also asked ASR/Domino for its "guidance" on "how sub-30 cent No 16 prices makes sense." After exchanging messages with ASR/Domino's Henderson about market conditions, Wistisen relayed competitor United's *forward* pricing information in full: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. Selling FY21 firm, good activity, little to no competition from NSM or Western." Henderson forwarded this information to Adam Whittaker at ASR/Domino, adding: "United is usually pretty upfront with [Wistisen]." Whittaker replied: "Good timing. Just off the phone with Ron. . . . United telling him they're at $36.50 for 2022 but very little activity for now . . . Ron also asking about raw prices . . . ." Upon information and belief, "Ron" is Ron Sterk of Sosland Publishing, the publisher of the Sosland Sweetener Report— suggesting that pricing intelligence was flowing not only through Wistisen but through other industry channels as well.

101.     On or about February 15, 2021, Wistisen pressed United's Speece on pricing intelligence: "Any action in FY22? Has United put a number on it yet? No word back from other processors/refiners, I'll send along indications." Speece quickly confirmed United's position: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any

28

changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" On February 16, 2021, Speece declined to put his position in writing: "Give me a ring and we can discuss."

102.    The next day, on or about February 17, 2021, Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50."

103.    On or about March 25, 2021, in response to the news that "Imperial's sugar will be marketed by United," Adam Whittaker, Director at Domino Foods, remarked that, "It's going to be more important than ever to stay close to United. To the point where we might want to start thinking about ways to work with them (*i.e.,* asking them for quotes [REDACTED]), on down the road. This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

104.    On or about April 29, 2021, Wistisen provided ASR/Domino's Henderson with a market pricing summary and asked him to confirm or correct it: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts." Henderson validated Wistisen's figures— "I believe your pricing numbers below are very accurate"—and supplemented them: "Prices in FY21 are very firm with both coast at $43.50/$44.00 bulk FOB basis. We heard RRV folks are tight and holding at $36.50 fob. For FY22, RRV at $35.50 big volume, $36.00 smaller volume fob. For us, closer to $39.00 gulf, $38.50 Florida and $41.50 both coasts. Close to 30% coverage for FY22."

105. On or about May 11, 2021, Wistisen wrote to ASR/Domino: "Are those higher spot prices, $43.50-44.00 holding up?" On May 12, 2021, Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at $44.00 fob bulk basis. The $31.50 #16 is also pushing white pricing up."

106. On or about May 17, 2021, Wistisen emailed Henderson, requesting pricing and inventory information: "Have you bumped up FY22 prices yet on explosive gains in No. 16 prices. . . . Where would you put refiner FY22 coverage?"

107. Later that same day, Henderson responded with ASR/Domino FY2l pricing: "FY21 prices - now at $45.00 fob bulk basis east and west coast. Down in Florida and gulf $44.00 fob bulk basis. FY22 prices - $42.00 fob bulk basis, $40.50 fob bulk basis Florida and the gulf. FY22 coverage - approximately 35 to 40%."

108. On or about May 18, 2021, Wistisen updated ASR/Domino on competitor United's current position: "Just talked with United: prices unchanged, spot and forward Hello!? But their head honcho is on vacation, bad timing Only about 40% covered. But expect big action over the next month, 20+% add to bookings, and at that time expect to raise prices, and not by just a dollar. . . .Western limping along, NSM picking off business. . . . They're still $36 spot and forward, 45-50% booked. NSM: . . . I believe they're $36 Renville and $38 west, 45-55?% booked."

109. On or about May 26, 2021, ASR/Domino's Henderson circulated an internal email, relaying pricing intelligence about ASR/Domino's competitors from his conversation with Wistisen: "Not surprised at the $37.75 fob rail for Cargill. In talking with Jenkins and Rich Wistisen they believe Cargill is offering $2.00 above RRV beets for FY22. United - 35.75 fob RRV for many decent size accounts. Cargill - 37.75 fob Gramercy for good rail volume."

30

110. On or about June 17, 2021, Wistisen emailed Henderson an update on crops and asked, "What are you seeing on the price and demand side of things?" Wistisen then explained:

I'm just getting going on pricing, but have heard a bit:

NSM: 35-36 net RRV, 37 net West. Claiming to be close to sold out at Brawley, 70% Renville, but only 40% booked Amalgamated.

United reportedly (I'll talk with them tomorrow) holding $36.50 gross, bigs are booking and getting discounts of about a buck or less, that's less than last season.

Western supposedly (I'll talk with them tomorrow) increased prices to $36.50 net, not getting many takers.

No talk on Michigan, yet. I hope to talk with them Fri/Mon.

Cane: I'm hearing Cargill is really chasing prices lower, a few deals under $37gross.

And that Southeast has slipped below $38?

But that ASR is holding firm on the coasts.

111. The next day, Henderson responded, "Word on the street is United moving up a $1.00 cwt since bookings now over 60%." He went on to share future prices for the 4th quarter of 2021:

"Cane prices firming up as #16 values rise.

Oct.- Dec. 21

East/West coasts ·- $44.00 gross fob bulk basis

Gulf - $42.00 gross fob bulk basis

Jan.- Dec. 22

East/West - $42.00 gross bulk basis

Gulf - $39. 75 gross fob bulk basis.

112. On or about July 12, 2021, Wistisen updated Henderson on market-wide sold positions and pricing: "Michigan and Western 80+% [booked], and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon). Hearing

31

NSM still a bit aggressive, at least into Texas." In the same email, Wistisen asked: "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

113.    That same day, Henderson updated Wistisen on ASR/Domino's pricing details: "Our pricing for remainder of FY2l is $48.00 bulk basis all locations. With raws remaining high in the Oct./Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf. For FY22 close to 65% booked and moving prices up. I haven't officially seen a United price increase but heard it's out there (+$2.00)." Henderson then forwarded Wistisen's message internally with a directive: "FYI below.........United price increase. Rich is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

114.    On July 16, 2021, Wistisen relayed United's position to ASR/Domino: "I don't understand it, but this is the word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm. . . . Any changes in ASR forward prices? I have you at $39.75 gulf and $42 coasts." Later, Wistisen added: "Well at least one group, your group, has their finger on the pulse of this market. The United info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result."

115.    Also on or about July 16, 2021, Henderson updated Wistisen on ASR's pricing: "We are now $40.50 gulf, $43.00 fob east and west coast."

**B.      Defendants Relied Upon the Exchanged Competitively Sensitive Information.**

116.    The Producer Defendants used the sensitive information they exchanged through Mr. Wistisen in furtherance of their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded Wistisen's pricing information to others at ASR/Domino

with a recommendation on what ASR/Domino would need to offer to win a specific customer's business. Likewise, United's Speece, believing a competitor's pricing was too low, told colleagues that United "may want to communicate pricing earlier than the colloquium to send a msg [message]." Knowing a competitor's sold position was not merely useful information—it was the basis for deciding when and how much to raise prices.

117. ASR/Domino's Henderson frequently forwarded the competitively sensitive information from Wistisen to his sales team and superior, ensuring coordination throughout ASR/Domino's organization. For example, when Henderson received information from Wistisen that competitor United would likely be adding bookings and raising prices "not by just a dollar," Henderson forwarded that information internally. In another example, Henderson sent his boss, Sproull, information on competitors' inventory positions that he received from Wistisen.

118. United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. United's Executive Vice President Dirk Swart told United's Speece that he wanted Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38 and that United was considering increases given its sold position. They deliberated about what they wanted to "indicate" to Wistisen before deciding to move the conversation off email and onto a phone call—a further sign of consciousness of wrongdoing.

119. United's Swart acknowledged that with "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" in which customers use pricing information to negotiate lower price. The conspiracy, in other words, served not only to raise prices but to strip Plaintiffs of their ability to negotiate lower prices.

\* \* \*

33

120. The Producer Defendants had no non-conspiratorial justification, much less any legitimate business justification, for using Commodity and/or other means to secretly share highly confidential and proprietary detailed information about their current and future prices and sold positions.

121. Defendants knew and intended that their private exchanges of competitively sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels that would have existed absent the anticompetitive conduct alleged herein.

122. The Producer Defendants were interested in achieving higher prices for Granulated Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

123. In fact, in a March 2019 internal presentation, United explained that it launched a new "Competitive Sourcing Project" in 2019 to, among other things, "[o]btain real-time market data on which competitors are supplying the lanes / customers (by geography)."

124. ASR/Domino similarly weaponized pricing as a competitive signal. It refrained from getting "aggressive" on pricing "to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

**C.    Defendants Agreed to a Common Formula to Fix Prices.**

125. In furtherance of their agreement to manipulate and fix the prices of Granulated Sugar, the Producer Defendants developed and agreed to standardized pricing formulas. For example, one of their formulas relied on publicly observed benchmarks, such as futures prices, to coordinate their pricing strategies and maintain artificially high price levels. This approach allowed

Defendants to obscure their collusion under the guise of market-driven practices while avoiding competitive pressures.

126. The Producer Defendants routinely referenced Number 16 spot prices to set their FOB pricing. For example, in February of 2021, Wistisen told Henderson that on the pricing side, sugar prices could increase thanks, *inter alia,* to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices." This communication highlights how shared adherence to such benchmarks reinforced collusion rather than competition.

127. Similarly, in July 2021, Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." Henderson later acknowledged that ASR/Domino was actively "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR's price of $40.50. United's executives admitted that this increase followed a "big huddle" among their marketing team, a clear signal of coordinated decision-making.

128. Even as Imperial operated outside the domestic production framework before its acquisition by United, it relied on similar pricing formulas tied to Number 16 prices. Notably, Imperial declared that "acting as a price-taker would put the whole business at risk," reinforcing its disinterest in genuine price competition. Such statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

129. The Producer Defendants' reliance on shared pricing formulas constitutes a *per se* violation of the Sherman Act. Any formula underlying price policies, whether or not executed uniformly, qualifies as unlawful concerted action. Courts have consistently recognized that

collusive reliance on formulas to set prices distorts free-market dynamics and undermines competition.[6]

130.    By agreeing to common pricing formulas based on Number 16 spot prices, the Producer Defendants created an environment where price-fixing was not only feasible but virtually guaranteed. This deliberate coordination eliminated the unpredictability inherent in competitive markets, ensuring stable yet inflated prices that directly harmed competition generally and consumers specifically.

**IV.     Sugar Prices' Increase in Parallel During the Conspiracy Period is Evidence of the Existence and Success of the Conspiracy.**

131.    Granulated Sugar prices increased significantly during the Conspiracy Period as a result of Defendants' conduct. As shown in Figure 2 below, nominal retail prices of Granulated Sugar rose 69% from January 2019 through October 2024:



**Figure 2.**

---

[6] *See* OECD, *Roundtable on Information Exchanges Between Competitors* - Note by the Delegation of the United States (2010), available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

132.    This increase was contrary to pricing patterns prior to the Conspiracy Period and is not explained by market forces, such as inflation (CPI)[7], as shown in Figure 3 below:



**Figure 3.**

133.    A similar pattern emerged with wholesale prices of refined sugar, the bulk of which is Granulated Sugar. As shown in Figure 4 below, U.S. refined sugar prices (in blue) rose beginning in or about January 2017 and continued to rise through 2023, even adjusting for inflation using CPI-U. By contrast, U.S. raw sugar prices (in orange) remained comparatively stable over the same period. The divergence between refined and raw sugar prices is significant: because raw sugar is

---

[7] Consumer Price Index ("CPI") is a price index of a basket of goods and services paid by urban consumers. Percent changes in the price index measure the inflation rate between any two time periods. CPI is a commonly recognized measure of inflation in the United States.

37

the primary input for refined sugar, production costs alone do not explain higher wholesale prices for refined sugar. Refined sugar prices receded after the filing of antitrust lawsuits beginning in March 2024.



**Figure 4.**

134. Tellingly, the same story emerges whether the sugar comes from beets or cane sugar, showing that they are commodity products that are part of the same relevant market.



**Figure 5.**



**Figure 6.**

135. These charts tell a different story than what was happening in the worldwide market, where the worldwide refined cane sugar prices closely tracked the worldwide raw cane sugar prices.



**Figure 7.**

136. Moreover, Granulated Sugar prices increased dramatically during the Conspiracy Period without a decline in the supply of Granulated Sugar. U.S. beet and cane sugar production increased from 8,999,000 short tons in 2018/2019 to an estimated 9,368,000 short tons in 2023/2024.

137. Defendants relied upon Wistisen at least as early as the first half of 2017 to enable it to fix or coordinate prices with the other Producer Defendants. As of mid-2022, wholesale sugar

40

prices were at their highest level since at least November of 1974 and continued to remain high until the filing of the initial antitrust lawsuit. Commencing on or about January 2017, wholesale prices experienced one of the steepest climbs ever. The same was true of retail prices, with the steep increase beginning in or about October 2019.

138. That the Producer Defendants—controlling more than 65% of the market—imposed the same dramatic price increases in parallel is not coincidence. It was a product of—and the goal of—the conspiracy.

139. The temporal proximity of the price increases to meetings of the executives of the Producer Defendants is further evidence of their illicit understanding. Many of the price increases at issue in this market occurred after ISC meetings, when participants had an opportunity to coordinate with one another. The ISC provided a perfect opportunity for such collusion.

140. In negotiating sales of sugar, sugar producers start with a price for bulk Granulated Sugar f.o.b. the refinery, which means that the purchaser takes possession of the sugar at the refinery. As most purchasers have sugar delivered, the negotiated price will add on the cost of freight to the f.o.b. price. The negotiated price may also include upcharges for packaging or converting Granulated Sugar into other forms of sugar.

141. The initial quoted price may be provided as a dollar amount per CWT which is the hundredweight price. Other times prices are quoted per pound. If the quoted price is $50 f.o.b. CWT that is equivalent to $0.50 a pound f.o.b.

142. In January 2019, beet processors announced that they would hold prices firm in the Midwest at $0.35 per pound f.o.b.—up from opening offers of $0.34 a year earlier.

143. As reported in April 2019, soon after the ISC meeting held that year, buyers who had paid beet sugar prices in the low 30 cents extending back to 2017 were shocked at a $0.02 to

41

$0.03 per pound increase. ASR/Domino had similarly increased prices to $0.37 per pound f.o.b. from its Northeast refineries from the $0.35-$0.36 it had charged the previous year.

144. By November 2019, ASR/Domino was offering its sugar on the spot market at $0.44 per pound f.o.b. from all its refineries.

145. In December 2019, early offers for beet sugar contracts for the 2020-21 season were between $0.36 and $0.38 per pound f.o.b. from the Midwest.

146. By February 2020, as the contract season began in earnest, Michigan Sugar offered its beet sugar for $0.385 per pound f.o.b. while ASR/Domino offered refined cane sugar for $0.41 per pound f.o.b. from all its refineries.

147. Defendants' communications with Wistisen further evidenced their parallel pricing. For example, Defendants held similar prices "firm" in parallel, which is another way of saying they would not be discounting to take market share. For instance, on September 21, 2020, United was "firm at $36.50 (no change) and now $38.50 on cane." (Emphasis added).

148. In 2020, spot prices for cane sugar reached seven-year highs in some instances and in the fourth quarter of 2020, they exceeded the high spot prices for 2019-2020.

149. On February 17, 2021, Wistisen conveyed the following to Henderson at ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50." (Emphasis added).

150. Nonetheless, in addition to holding prices firm in parallel, Defendants increased their prices in parallel. For example, although United initially communicated it was holding prices firmly at $36.50 and $38.50, it also conveyed its plan to increase prices when the time came. On May 18, 2021, Wistisen told Henderson that he had just talked with United, and to "expect big action over the next month, . . . and at that time expect to raise prices, and not by just a dollar . . . ."

In June 2021, ASR/Domino offered its refined cane sugar for $0.42 per pound f.o.b. from its Northeast and West Coast refineries.

151. In or about early August 2021, ASR/Domino increased its price for sugar in the 2021-22 contract period to $0.44 from its Northeast and West Coast refineries. By late August 2021, ASR/Domino increased its prices to $0.45 f.o.b. from its Northeast and West Coast refineries.

152. A few weeks later, ASR/Domino raised its prices to $0.51 per pound f.o.b. for all refineries for delivery from October through December 2021 and to $0.47 per pound from its Northeast and West Coast refineries beginning in January 2022.

153. In October 2021, ASR/Domino raised its price for the rest of 2021 to $0.55 per pound f.o.b. from all its refineries and $0.48 per pound from its Northeast and West Coast refineries and $0.46 cents from its Gulf and Southeast refineries beginning in about January 2022.

154. Soon after the 2022 ISC ended, prices rose by 25% in many instances from the prices for which sugar was contracted for in 2022-23.

155. For the 2023-2024 contracting year, starting beet sugar prices were in the range of $0.54 to $0.58 per pound f.o.b. in the Midwest, a 35% increase from the 2022-2023 contracting year. ASR/Domino offered refined cane sugar at $0.59 per pound f.o.b. from its Northeast and West Coast refineries.

156. Despite adequate sugar supplies, parallel price increases continued throughout the year for both cane and beet sugar. ASR/Domino increased to $0.60 per pound f.o.b. Northeast and West Coast in April 2023 for the 2023-2024 contracting year. Beet sugar prices were firm in the $0.55 to $0.58 per pound range. In or about May 2023, ASR/Domino increased its prices for 2024

43

to $0.61 a pound f.o.b. Northeast and West Coast and $0.59 per pound f.o.b. for Southeast and the Gulf.

157. In or about October 2023, ASR/Domino offered its refined cane sugar for 2024 at $0.63 per pound f.o.b. from its Northeast and West Coast refineries.

158. With the start of the contracting season for 2024-25 beginning in earnest in February 2024, buyers saw offers of $0.53 to $0.55 per pound f.o.b. in the Midwest while ASR/Domino offered bulk refined cane sugar at $0.60 per pound f.o.b. from its Northeast and West Coast refineries.

159. The DOJ Findings of Fact in the merger case concluded that Defendants were "interdependent," meaning that if one Defendant raised prices, the others would similarly raise prices in parallel. The DOJ further concluded that "Competitors closely monitor one another's pricing and sold positions" and that "[t]here is ample evidence that United and others recognize their strategic interdependence, accounting for price signals they send as well as receive. United sends messages or signals to competitors about pricing and consider how its own actions may cause market-wide prices to decline [or increase]." For example, United's CEO, Wineinger, explained a strategic decision whereby United "pull[ed] some older offers while sending a message to NSM and other competitors that we were not interested in allowing the market to slip lower. And United at times pulls its competitive punches for fear of prices dropping."

160. The DOJ Findings of Fact further concluded that, just like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline." The DOJ Findings of Fact cited to Imperial's Henneberry expressing concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement"; and Domino's

Henderson explaining a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." Domino's Robert Sproull instructed Henderson to "signal to the market" that there would be tightness and Domino would maintain price.

161. As further evidence of parallel conduct, ASR/Domino bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to United," and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry." Further, "[a]fter speaking with his 'trusted friend,' Imperial's CEO, Domino's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [Domino]."

162. The parallel pricing resulted in dramatic overall increases in the sugar market. Wholesale prices started dramatically increasing upward beginning in January 2017. On information and belief, the Producer Defendants and their co-conspirators employed Wistisen/Commodity at least as early as January 2017 to enable them to fix or coordinate prices. Wholesale prices experienced one of the steepest climbs ever.

163. The following chart depicts the PPI for the Granulated Sugar Manufacturing sector during the Conspiracy Period and the five years preceding it.

45



PPI industry data for Sugar mfg, not seasonally adjusted

Click and drag in the plot area to zoom in. Hover over chart to view data.
Source: U.S. Bureau of Labor Statistics.

## V. Additional Plus Factors Support the Existence of a Conspiracy

164. In addition to the direct evidence of unprecedented price increases and extensive information sharing by the Producer Defendants, as well as the dramatic price increases imposed by each of the Producer Defendants during the Conspiracy Period, there are other economic factors, also known as "plus factors" in antitrust parlance, that support an inference of collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," that thus support an inference of a conspiracy.[8] The exchange of private, competitively sensitive information among competitors, as described above, is a plus factor that strongly supports an inference of collusion.

---

[8] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law,* 110 Mich. L. Rev. 393, 393 (2011).

165. Here, in addition to the information sharing, plus factors that further support an inference of collusion include: (a) sugar industry consolidation and concentration, (b) high barriers to entry, (c) inelastic demand, (d) high vertical integration, (e) opportunities to collude, (f) the fungible, commodity nature of Granulated Sugar, and (g) a history of antitrust violations by sugar manufacturers, including a number of the Producer Defendants and/or their predecessors.

**A.    The Market is Highly Concentrated, and Defendants Are the Dominant Firms.**

166. During the Conspiracy Period, the Producer Defendants controlled approximately 65% of the U.S. market. No remaining producer of Granulated Sugar came close to the Producer Defendants' individual or collective market share.

167. United's 2023 acquisition of Imperial—and United's assumption of Imperial's marketing—further concentrated the market, leaving ASR/Domino and United as the dominant duopoly.

**B.    Barriers to Entry Are High.**

168. There are high barriers to becoming a manufacturer of Granulated Sugar. Meaningful competition with today's Granulated Sugar producers would require, at least, millions in start-up capital. Granulated Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Plus, unlike some industries, a new entrant cannot simply build capacity—it must also secure USDA loans and production allotments that enable growers to process raw sugar into Granulated Sugar without competition from imports, which are effectively controlled by incumbents and require the manufacturer to be vertically integrated with growers of sugar beets or sugar cane. USDA production allotments linked to USDA loan programs and limitations on imports and tariffs further insulate the Producer Defendants by precluding foreign competitors from entering the U.S. market.

47

## C. Demand for Sugar is Inelastic.

169. Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

170. Demand for Granulated Sugar is inelastic, meaning that price increases do not cause proportionate reductions in demand. Producer Defendants' customers like Plaintiffs had no meaningful substitutes, and adjusting recipes to account for substitutes would be costly for Plaintiffs. Defendants thus recognized that Granulated Sugar demand was inelastic. The Producer Defendants knew that they could demand higher prices when less Granulated Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Granulated Sugar.

## D. Defendants Are Vertically Integrated.

171. The Granulated Sugar industry is almost entirely vertically integrated, meaning that each major producer owns or controls the full chain of production: from growing sugar cane or sugar beets and processing these crops into raw sugar using their own processing facilities to refining the raw sugar into Granulated Sugar in their own refining facilities and selling their Granulated Sugar to direct purchasers.

172. Vertical integration reinforces market concentration: A new entrant cannot simply enter at the refining stage but must acquire or contract for upstream supply as well. It also aligns the interests of producers across the supply chain, making coordination easier to sustain.

173. The President and CEO of Imperial prior to its acquisition by U.S. Sugar testified that it was difficult for Imperial to compete with the other Granulated Sugar producers because it was not vertically integrated. Until Imperial was acquired by U.S. Sugar, it did not grow sugar cane or have direct access to domestic raw sugar cane in the United States. Imperial had to import

raw cane sugar to manufacture Granulated Sugar. As a result, Imperial's costs were typically higher than the other Granulated Sugar producers.

**E.      Defendants Had Numerous Opportunities to Collude.**

174.     In addition to Commodity-facilitated information exchange and direct competitor communications, Defendants had structured opportunities to collude through the annual ISC, organized by the International Dairy Foods Association ("IDFA") each February.

175.     The IDFA has characterized the purpose of the ISC as follows: "[t]he Colloquium draws hundreds of professionals and decision-makers from the sweetener industry and from companies that use sweeteners in the products they make. Buyers, processors, refiners, distributors, and food companies actively participate in the Colloquium, using it as a springboard to enhance their business and trading-partner networks."

176.     The ISC was suspended as an in-person event in 2020-2021 due to the pandemic but resumed in 2022. Representatives of Defendants attended the ISC in 2019 and each year from 2022 through 2024. The 2019 session featured extensive presentations on the factors expected to dictate sugar prices in the coming year, providing both the occasion and pretext for competitor pricing discussions.

177.     Sideline discussions at the ISC were a prime opportunity for collusion. The event consistently served as the starting gun for the following year's pricing: in 2022, for example, Number 16 contract prices were discussed at the ISC and finalized in the weeks immediately following, with those prices then used to estimate futures and develop actual spot prices through 2023. Further discussion of pricing developments following ISC meetings is presented in Section IV, above.

178.     In addition to participating in the ISC, the Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as

49

the Sugar Association and the American Sugar Alliance. These memberships afforded them opportunities to collude throughout the Conspiracy Period. In addition, the Producer Defendants, directly or through their affiliates, hold board positions on these trade associations. For example, as of January 1, 2026, the Board of the Sugar Association includes Pepe Fanjul, Jr. (ASR/Domino), Mike Gorrell (U.S. Sugar Savannah, wholly owned by U.S. Sugar, one of the members of United), Mike Greear (Wyoming Sugar Company, one of the members of United), Ken McDuffie (U.S. Sugar, one of the members of United), Peter O'Malley (ASR/Domino), and Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino).[9] As of October 3, 2024, the Board of the Sugar Association also included Fanjul, Greear, O'Malley, Shackelford, and Sproull, as well as Matt Hoffman (Sugar Cane Growers Cooperative of Florida, a parent of ASR/Domino).[10] As of March 27, 2019, the Board of the Sugar Association also included Fanjul, Gorrell, Greear, O'Malley (as Vice-Chair), and Shackelford, as well as Tom Astrup (American Crystal Sugar Company, a member of United) and David Goodlett (Sugar Cane Growers Cooperative of Florida, a parent of ASR/Domino).[11] These overlapping board memberships placed the same individuals from ASR/Domino and United in recurring, structured contact throughout the Conspiracy Period, providing sustained opportunities to conspire.

179. Further, the crossover of employees among the Defendants provided additional opportunities to collude or exchange competitively sensitive information. For example,

---

[9] At some point after January 1, 2026, the Sugar Association removed its board members from the webpage where they previously appeared. *Compare* The Sugar Association, *Board Members*, https://www.sugar.org/about/board/ (last visited January 24, 2026) ("It looks like the page you're looking for can't be found or doesn't exist."), *with* https://web.archive.org/web/20260101230001/https://www.sugar.org/about/board/ (showing board members as of January 1, 2026).

[10] https://web.archive.org/web/20241003140517/https://www.sugar.org/about/board/.

[11] https://web.archive.org/web/20190327233312/https://www.sugar.org/about/board/.

ASR/Domino's director of national accounts, Adam Whittaker, ASR/Domino's national accounts manager, Brian Dahlman, and United's director of strategic accounts, Eric Speece, were each former employees of Cargill. Whittaker worked at Cargill for more than a decade before joining ASR/Domino, while Speece worked at Cargill for about nine years prior to joining United. Both Whittaker's and Speece's employment at Cargill overlapped for a five-year period. Whittaker, Speece, and Dahlman were all involved in the exchange of competitively sensitive information as described in the email exchanges detailed herein.

**F.      Granulated Sugar is a Commodity.**

180.    As detailed above, Granulated Sugar is a fungible commodity that competes primarily on price. That characteristic facilitates a price-fixing conspiracy: firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

181.    Futures contracts for domestic raw cane sugar and "White Sugar" (symbol "W") are traded on the Intercontinental Exchange ("ICE") alongside other commodity products such as wheat, crude oil, and gold. [12] Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service. The commodity nature of Granulated Sugar helps to facilitate cartel behavior.

---

[12] ICE, *Products - Futures & Options,* https://www.ice.com/products/Futures-Options/Agriculture (last visited Nov. 12, 2024).

182.     Due to the lack of significant product differentiation, the Producer Defendants were forced to compete on price such that the pricing decisions of each Granulated Sugar producer affect the market price for Granulated Sugar.

183.     In sum, the Granulated Sugar industry combines every structural feature that makes the market susceptible to cartel behavior: high concentration, vertical integration, high barriers to entry, inelastic demand, and a commodity product. Against that backdrop, the Producer Defendants and their co-conspirators formed a cartel to raise, fix, maintain, or stabilize Granulated Sugar prices during the Conspiracy Period, systematically exchanging competitively sensitive, non-public, material information in furtherance of their price-fixing conspiracy. As a result, Defendants' unlawful conduct caused Plaintiffs to pay artificial prices for Granulated Sugar during the conspiracy period. These prices exceeded the amounts they would have paid if the prices for Granulated Sugar had been determined in a competitive market. Plaintiffs suffered antitrust injury because of Defendants' conduct.

**G.     There is a History of Anticompetitive Conduct in the Sugar Industry.**

184.     The sugar industry in the United States has long been plagued by anticompetitive practices, with violations of antitrust laws dating back nearly a century. This historical pattern of misconduct serves as a backdrop to the present conspiracy, highlighting the industry's susceptibility to collusion and the Defendants' deliberate perpetuation of these unlawful practices.

185.     ***1930s: The Sugar Institute Case.*** For example, in the 1930s, the United States Supreme Court addressed the antitrust violations of the Sugar Institute, a trade association for sugar manufacturers.[13] The Court upheld findings that the Sugar Institute engaged in collusion by mandating advance price announcements and strict adherence to those announced prices and terms.

---

[13] *United States v. Sugar Institute*, 297 U.S. 553, 582 (1936).

These practices stifled competition and allowed manufacturers to control the market, setting a precedent for subsequent antitrust enforcement in the sugar industry.

186. ***1948: American Crystal Sugar and Uniform Pricing Agreements.*** The anticompetitive tendencies of the sugar industry resurfaced in 1948 when the Supreme Court examined the activities of American Crystal Sugar, now part of Defendant United.[14] The case centered on agreements among California sugar refiners to pay uniform prices for sugar beets. The Court condemned this arrangement, noting its far-reaching monopolistic effects. By eliminating price competition among refiners, the agreements deprived sugar beet growers of any competitive opportunity, increased market control over sugar sales, and entrenched a monopolistic structure. The Court's decision underscored the inherent dangers of collusion in the sugar industry and its devastating effect on competition.

187. ***1970s: Broker-Facilitated Price Fixing.*** In the 1970s, the DOJ uncovered another collusive scheme involving sugar refiners, including California & Hawaiian Sugar Company (later acquired by Defendant ASR/Domino) and American Crystal Sugar Corporation (part of Defendant United). The sugar refiners were accused of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.[15] This led to a 1978 consent decree prohibiting such conduct, including direct communications about future prices and the use of intermediaries to facilitate price discussions. Defendants' conspiracy here was a replay of the scheme the DOJ enjoined nearly five decades earlier.

---

[14] *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 221 (1948).

[15] *United States v. Great Western Sugar* Co., *et al.*, No. 74-2674-SW at 1415 (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar Company, American Crystal Sugar Company (now part of United), Amalgamated Sugar Company, and other sugar refiners).

188.    ***Private Litigation and Settlements.*** The DOJ's actions in the 1970s sparked multiple private class action lawsuits on both coasts of the United States, where courts certified classes of affected consumers. These cases ultimately settled, further illustrating the pervasiveness of anticompetitive practices in the sugar industry and the widespread harm inflicted on consumers.[16]

189.    The history of antitrust violations in the sugar industry reveals a consistent and deliberate pattern: sugar producers and refiners have repeatedly used information exchanges and pricing agreements to suppress competition. Defendants' conduct in the present case is a continuation of this troubling legacy, exploiting structural vulnerabilities in the industry to agree upon and maintain artificially high prices for Granulated Sugar.

## VI.    Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act

190.    Competition can be harmed when, as here, competitors with market power in a concentrated market exchange confidential, strategic information about current and forward-looking plans for prices and supply. Price, capacity, supply, and costs are crucial aspects of competition. Information exchanges can advance competitors' ability to collude—and here, the evidence that they did is straightforward: prices rose and remained elevated throughout the period during which the Producer Defendants were exchanging information through Commodity, a pattern inconsistent with competitive market dynamics and consistent with coordinated pricing.

191.    It is long-held Supreme Court precedent that exchanges of competitive information among competitors may independently violate Section 1, even without an express agreement to

---

[16] *See In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus. Antitrust Litig.,* MDL No. 2201, 1976 WL 1374 (N.D. Cal. May 12, 1976), *mandamus denied,* 559 F.2d 481 (9th Cir. 1977).

fix prices. "Exchanges of current price information . . . have the greatest potential for generating anti-competitive effects and ... have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals." *American Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am.*, 393 U.S. 333, 336-38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry).

192.    The Second Circuit has explained, "'[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'" *Todd*, 275 F.3d at 199 (2d Cir. 2001) (quoting *Gypsum*, 438 U.S. at 441 n.16). "[E]xchanges of current price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act."[17]

193.    The FTC and DOJ have stated that information exchanges with direct competitors raise serious antitrust concerns:

> [T]he sharing of information related to a market in which . . . the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is

---

[17] *In re SSA Bonds Antitrust Litig.*, No. 16-cv-3711 (ER), 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) (citing *Gypsum,* 438 U.S. at 441 n.16).

more likely to raise competitive concern than the sharing of information relating to less competitively sensitive information.[18]

194.   DOJ has demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, DOJ withdrew antitrust policy statements that provided safe harbors for sharing pricing or cost information, concluding that the policy statements were "*overly permissive* on certain subjects, *such as information sharing*, and no longer serve[d] their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." In December 2023, the Federal Trade Commission and DOJ jointly withdrew the Antitrust Guidelines for Collaboration Among Competitors, and explained that "[t]he Agencies are committed to vigorous antitrust enforcement on a case-by-case basis in the area of competitor collaborations because such collaborations can harm competition and subvert the competitive process."[19]

195.   In an *amicus* brief filed on October 1, 2024, in *In re Pork Antitrust Litig.,* No. 0:18-cv-01776-JRT-GFD (D. Minn.) (ECF No. 2616), the DOJ explained that information sharing by itself can violate the antitrust laws:

> As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp.*, reciprocal information exchange among competitors is "concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) . . . . This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." *Id.*; *see, e.g.*, *Todd*, 275 F.3d at 198 (recognizing that an "information exchange itself" can form a claim under Section 1).

---

[18]Fed. Trade Comm'n & U.S. Dep't of Just. (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

[19] Justice Department and Federal Trade Commission Withdraw Guidelines for Collaboration Among Competitors, https://www.justice.gov/atr/media/1380001/dl?inline.

*Id.* at 5-6.

196. With respect to a standalone information exchange, DOJ went on to say: "Standalone information-sharing claims are evaluated under the rule of reason . . . . If information sharing tends to harm competition based on the full factual circumstances, 'liability follow[s].'" *Id.* at 7-8 (quoting *Gypsum*, 438 U.S. at 446-47 n.22).

197. DOJ also reiterated that information sharing can also support the inference of a price-fixing conspiracy, as Plaintiffs have also alleged here, explaining:

> Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a "plus factor" suggestive of a price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979); *Todd*, 275 F.3d at 198; *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

*Id.* at 5-6. In such circumstances, the *per se* rule of antitrust liability applies.

198. Indeed, the "[e]xchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors." *Id.* at 12 n.9.

199. Here, Defendants' information exchange existed for the purpose of increasing prices of Granulated Sugar above competitive levels and aiding the Producer Defendants in abusing their market power to suppress price competition.

200. Defendants' information exchange took place in secret and involved the exchange of confidential, current, and forward-looking information.

57

201. Further, Defendants' information exchange occurred in markets with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including markets with inelastic demand, relatively few sellers, and a fungible product, for which competition is price-based.

202. As a result, prices for Granulated Sugar rose significantly during the Conspiracy Period.

203. There is no legitimate procompetitive justification for Defendants' conduct.

204. Defendants' information sharing practices even violate a government policy—the Health Care Policy Statements—that DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

205. Defendants, through their use of Commodity and Wistisen to exchange non-public current and forward price and sales information, have caused direct anticompetitive effects across the nation in the form of higher prices to U.S. direct purchasers, including Plaintiffs.

## VII. The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible

206. Defendants' anticompetitive scheme was not constrained by the USDA Sugar Program. This government program, established under the Agriculture and Food Act of 1981, is said to stabilize sugar prices domestically. Over the years, Congress has reauthorized the program, most recently with a minor adjustment in 2018, which increased loan rates for raw cane and refined beet sugar by 5%.

207. While the USDA Sugar Program sets certain parameters for the domestic sugar market, it neither dictates final pricing nor shields producers from domestic competition. Instead, it provides mechanisms like price support loans, marketing allotments, and import quotas to maintain baseline sugar prices in the United States. However, these measures do not preclude the existence—or effect—of price-fixing conspiracies like the one alleged here.

208.     The price support loans offered by the USDA allow sugar processors to borrow against their inventory at predetermined rates. If market prices fall below these levels, processors can forfeit their sugar as loan repayment. Yet, during the Conspiracy Period, there were no forfeitures, indicating that market prices consistently exceeded the USDA's effective support levels.

209.     The Farm Service Agency ("FSA") produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand Estimates report are likely to lead to forfeitures.[20] The FSA's projections have concluded that forfeitures are unlikely for every quarter since March 2019.[21] This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.[22]

210.     The lack of sugar loan forfeitures since 2019 suggests that market prices have been above the effective support level since 2019. As a result, the loan program did not serve as a binding constraint on sugar prices, leaving ample room for Defendants to manipulate the market upward.

211.     The USDA also administers annual marketing allotments to cap the amount of sugar that processors can sell domestically for human consumption. While this mechanism seeks to

---

[20] "USDA Announces No Actions under Feedstock Flexibility Program," *Farm Service Agency* (March 29, 2019), available at https://www.fsa.usda.gov/news-events/news/03-29-2019/usda-announces-no-actions-feedstock-flexibility-program. ("USDA's March 8, 2019, World Agricultural Supply and Demand Estimates report (http://www.usda.gov/oce/commodity/wasde) projects that fiscal 2019 U.S. ending sugar stocks are unlikely to lead to forfeitures.").

[21] FSA reports are released quarterly, with the most recent dated June 30, 2026. For all news releases, *see* https://www.fsa.usda.gov/news-events/news.

[22] "Loan Forfeitures - National Level," *Farm Service Agency,* available at https://fcp-apps-fsa.fpac.usda.gov/sorspub/reports/web/public/loan-forfeiture-national.

prevent overproduction from depressing prices, it explicitly excludes limits on agricultural production or processing.

212.    The USDA enforces tariff-rate quotas ("TRQs") on imported sugar under the World Trade Organization's Uruguay Round Agreement. While these quotas protect domestic producers by limiting the amount of foreign sugar entering the market duty-free, they set minimum, not maximum, levels for imports. Throughout the Conspiracy Period, TRQs were close to these minimum levels, providing limited external competitive pressure to counteract the Producer Defendants' collusive pricing strategies.

213.    The USDA Sugar Program does not actively regulate market prices for Granulated Sugar. Instead, it provides a framework that Defendants exploited to execute their conspiracy. By using information about supply limitations and production allotments, the Defendants coordinated pricing in a manner that was neither compelled by nor consistent with the goals of the USDA program.

214.    While the USDA Sugar Program establishes a supportive baseline for domestic producers, it does not authorize, facilitate, or necessitate price-fixing. The conspiracy alleged in this case operated independently of the USDA's regulatory framework, leveraging market dynamics to harm competition, overcharge consumers, and violate antitrust laws.

## VIII.    Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs to Suffer Antitrust Injury and Damages

215.    Because of the Defendants' anticompetitive conduct: (1) competition in the Granulated Sugar market has been reduced or eliminated, (2) prices for Granulated Sugar have been maintained at supra-competitive levels, and (3) United States purchasers of Granulated Sugar have been deprived of the benefit of price competition.

216. As a result of the Defendants' anticompetitive conduct, Plaintiffs paid more for Granulated Sugar than they otherwise would have paid and thus suffered antitrust injury and damages. The overcharges paid by Plaintiffs for Granulated Sugar constitute antitrust injury and harm to competition under the federal antitrust laws.

**LIMITATIONS AND TOLLING**

217. Plaintiffs bring this action within the applicable statute of limitations. The Sherman Act provides a four-year statute of limitations for civil damages actions. 15 U.S.C. § 15b. For the reasons set forth below, Plaintiffs' claims are timely under three independent and cumulative doctrines: (1) fraudulent concealment, (2) the continuing violation doctrine, and (3) *American Pipe* tolling.

## I. Fraudulent Concealment

218. By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statutes of limitations for Plaintiffs with respect to any claims and rights of action that Plaintiffs have alleged in this Complaint.

219. In addition, throughout the Conspiracy Period, Defendants took deliberate steps to conceal their unlawful conspiracy from Plaintiffs. The conspiracy was also inherently self-concealing: competitors do not announce that they are sharing pricing intelligence through an intermediary, and the absence of any public trace of Commodity's operations ensured that the exchange remained invisible to the market.

220. ASR Group's own Code of Ethics and Business Conduct confirms that its employees knew the conduct alleged here was prohibited. The Code expressly bars "agreements with competitors to fix or control prices" and prohibits "engag[ing] in direct or indirect discussions or contacts with competitors regarding ... [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be

61

sold[;] ... [and] [b]usiness, marketing or strategic plans." ASR Group's promise to conduct business "in a lawful and ethical manner" was the public face it presented to customers like Plaintiffs—a representation Plaintiffs reasonably relied upon.

221. United's Code of Business Conduct and Ethics similarly committed United to "[o]beying the law, both in letter and in spirit," and to "outperform our competition fairly and honestly." United also imposed an "obligation to protect [United's] assets [including United's] confidential information" and prohibited "[u]nauthorized use or distribution of United Sugars' confidential information," confirming that United's employees understood they were not permitted to share the information they were systematically providing to Wistisen.

222. Defendants' promises to obey the law and behave with integrity prevented Plaintiffs from discovering Defendants' conduct earlier.

223. Plaintiffs had no reason to suspect that the prices they were paying reflected coordinated collusion rather than competitive market conditions, particularly given the Producer Defendants' public commitments to lawful conduct and the absence of any public trace of Commodity's intelligence-sharing operation.

224. Commodity further concealed the conspiracy by maintaining no public presence whatsoever: it maintained no public website and did not market its services openly. Its subscription model also was itself a concealment mechanism: only producers who contributed competitively sensitive information received the reports, and the reports expressly prohibited subscribers from sharing them outside their companies. Plaintiffs, as customers rather than producers, were not subscribers and had no means of discovering that their suppliers were exchanging pricing intelligence through this channel.

225. Plaintiffs were not placed on actual or constructive notice of the conspiracy alleged in this Complaint until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of Defendants' unlawful conduct could not have been discovered until the appellate exhibit volumes from the DOJ matter were made public on or about November 1, 2022.

226. Because the conspiracy was fraudulently concealed, the statute of limitations did not begin to run until Plaintiffs discovered—or reasonably should have discovered—the conspiracy, no earlier than November 1, 2022. Plaintiffs exercised reasonable diligence in seeking to discover the conspiracy and could not have discovered it earlier through the exercise of reasonable diligence given the deliberate concealment measures described above. Accordingly, Plaintiffs' claims encompass the full Conspiracy Period, starting in or about January 2017.

## II.     Continuing Violation

227. Even absent fraudulent concealment, Plaintiffs' claims are independently timely under the continuing violation doctrine. The Eighth Circuit held in *In re Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059 (8th Cir. 2017) (en banc), that "in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, "starts the statutory period running again."' *Id*. at 1063 (quoting *Klehr v. A.O. Smith Corp*., 521 U.S. 179 (1997)).

228. The Producer Defendants made sales of Granulated Sugar to Plaintiffs at supra-competitive prices throughout the Conspiracy Period and continuing through at least 2024. Each such sale constitutes an overt act that is part of the violation and that injures Plaintiffs, independently restarting the limitations period.

63

229. Plaintiffs purchased substantial quantities of sugar from the Producer Defendants, including the following approximate totals between 2022 and 2024: (a) more than $1.5 billion by all Plaintiffs from United Sugar, U.S. Sugar, American Crystal, and Minn-Dak; (b) more than $800 million by all Plaintiffs from ASR/Domino.

### III.  *American Pipe* Tolling

230. In addition, any applicable statutes of limitations for Plaintiffs with respect to any claims and rights of action that Plaintiffs have alleged in this Complaint has been tolled since March 14, 2024, under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny. On March 14, 2024, the first of multiple putative class action complaints alleging claims arising from the same course of conduct alleged here was filed in *KPH Healthcare Servs., Inc. v. ASR Group Int'l, Inc., et al.*, No. 1:24-cv-01941 (S.D.N.Y. Mar. 14, 2024). *See* Class Action Complaint, Dkt. 1, *KPH Healthcare Servs., Inc. v. ASR Group Int'l, Inc., et al.*, No. 1:24-cv-01941 (S.D.N.Y. Mar. 14, 2024). The putative class in *KPH* was "All direct purchasers of Granulated Sugar from the [defendants including ASR/Domino and United] in the United States, beginning January 1, 2019, to the present." *Id.* ¶ 128. Excluded from the putative class were "(a) Defendants and their subsidiaries and affiliated entities and (b) all federal or state government entities or agencies." *Id.*

231. Each Plaintiff here, as a direct purchaser of Granulated Sugar from ASR/Domino and/or United in the United States between January 1, 2019, and March 14, 2024, was a member of the putative class in *KPH* and was not excluded from the class definition. On June 7, 2024, the U.S. Judicial Panel on Multidistrict Litigation transferred *KPH* to *In re: Granulated Sugar Antitrust Litigation*, No. 0:24-md-03110 (D. Minn.) ("*Sugar MDL*"), and centralized it with similar cases on behalf of direct purchaser putative classes of which each Plaintiff here was a member. *See* Transfer Order, *Sugar MDL*, Dkt. 1. The putative class representative in *KPH* ultimately filed

consolidated claims arising from the same course of conduct alleged here, along with other putative direct purchaser class representatives. *See* Direct Purchaser Plaintiffs' Short-Form Consolidated Class Action Complaint, *Sugar MDL*, Dkt. 341. The putative direct purchaser class is defined as "All persons and entities who purchased Granulated Sugar directly from any of the [defendants including ASR/Domino and United] or any of their co-conspirators in the United States and its territories at any time from January 1, 2019, until the present." *Id.* ¶ 12. "Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action." *Id.*

232. Each Plaintiff here, as a direct purchaser of Granulated Sugar from ASR/Domino and/or United or any of their co-conspirators in the United States and its territories between January 1, 2019, and March 14, 2024, is a member of the putative class consolidated in the *Sugar MDL*. Thus, at all times since March 14, 2024, each Plaintiff here has been a member of at least one pending, putative class alleging claims arising from the same course of conduct alleged here. As a result, any applicable statutes of limitations for Plaintiffs with respect to any claims and rights of action that Plaintiffs have alleged in this Complaint has been further tolled since March 14, 2024.

## CLAIMS FOR RELIEF

### COUNT I: PRICE FIXING

**VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3) ON BEHALF OF ALL PLAINTIFFS**

233.     Plaintiffs incorporate and reallege, as though fully set forth here, each and every allegation set forth in the preceding paragraphs of this Complaint.

234.     The Producer Defendants are direct competitors in the Granulated Sugar market throughout the United States.

235.     Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, to raise, fix, maintain, or stabilize Granulated Sugar prices.

236.     Since at least 2017, Defendants agreed with each other to exchange competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain, or stabilize the prices of Granulated Sugar.

237.     The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States.

238.     Pursuant to the agreement, Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold to Plaintiffs. This conduct is unlawful under the *per se* standard.

239.     Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications.

66

240. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

241. For all these reasons, Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

242. As a direct and proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act, Plaintiffs have suffered injury to their business and property. Plaintiffs are entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act (15 U.S.C. § 15).

## COUNT II: UNLAWFUL INFORMATION EXCHANGE

## VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3) ON BEHALF OF ALL PLAINTIFFS

243. Plaintiffs incorporate and reallege, as though fully set forth here, each and every allegation set forth in the preceding paragraphs of this Complaint.

244. For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Granulated Sugar. The Producer Defendants now have a collective 65% of the Granulated Sugar market and thus possess market power within it.

245. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 2017 and continuing through at least October 2024, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States to or at supra-competitive levels.

246. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing

67

prices in the Granulated Sugar market in the United States to or at supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

247.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar sold in the United States to Plaintiffs to or at supra-competitive levels.

248.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

249.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

    a.    Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the United States;

    b.    Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States; and

    c.    Plaintiffs have been deprived of the benefits of free and open competition.

250.    For all these reasons, Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

251.    As a direct and proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act, Plaintiffs have suffered injury to their business and property. Plaintiffs are

68

entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Section 4 of the Clayton Act (15 U.S.C. § 15).

## PRAYER FOR RELIEF

252. Accordingly, Plaintiffs respectfully request joint and several judgment against Defendants, as follows:

A. That the Court adjudge and decree that the unlawful contract, combination, and conspiracy alleged herein is in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

B. That the Court award Plaintiffs three times their damages sustained from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15(a));

C. That the Court award Plaintiffs their costs of this case and reasonable attorneys' fees under Section 4 of the Clayton Act (15 U.S.C. § 15(a));

D. That the Court award Plaintiffs pre- and post-judgment interest to the extent allowed by law, including 15 U.S.C. § 15(a) and 28 U.S.C. § 1961; and

E. That the Court award Plaintiffs such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: July 24, 2026

Respectfully submitted,

By: */s/ Brandon D. Fox*
　　　Brandon D. Fox

Brandon D. Fox (Bar No. 6272239)
Sati Harutyunyan (*pro hac vice application forthcoming*)
JENNER & BLOCK LLP
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 239-5100
bfox@jenner.com
sharutyunyan@jenner.com

Andrianna Kastanek (Bar No. 6286554)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

Jariel A. Rendell (*pro hac vice application forthcoming*)
JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, DC 20001
(202) 639-6000
jrendell@jenner.com

**Attorneys for Plaintiffs**